JOHN H. OSBORNE, appellant,

*v.*

CATHARINE C. O'REILLY, executrix, respondent.

A court of equity will refuse to compel an executrix to account for her tes-
tator's transactions, where the party asking for the account has been guilty of
great laches in failing to obtain an accounting during the lifetime of the testator,
and does not show a probability that the balance will be in his favor.

On appeal from a decree of the chancellor, whose opinion is
reported in *Osborne* v. *O'Reilly, 15 Stew. Eq. 467.*

*Mr. H. A. Drake,* for appellant.

*Mr. P. L. Voorhees* and *Messrs. James A. O'Reilly* and *Cyrus
G. Derr,* of Pennsylvania, for respondent.

The opinion of the court was delivered by

DIXON, J.

On April 2d, 1860, Patrick O'Reilly made affidavit that John

H. Osborne owed to him the sum of $6,000, and was not a resident of this state, and, having filed such affidavit with the clerk of the circuit court of Camden county, caused a writ of attachment to be thence issued against said Osborne, which was levied upon $6,650 of the preferred stock of the Camden and Atlantic Railroad Company.

In January, 1861, Osborne exhibited his bill in chancery, alleging that there were various complicated matters of account existing between himself and O'Reilly, including the claim made under the attachment, and praying that a full account of those matters might be taken in chancery, and that the suit at law might be enjoined. In June, 1864, O'Reilly filed his answer, consenting to the settlement in chancery of all unadjusted matters between himself and the complainant. Nothing further was done in the cause until after O'Reilly's death, which occurred in 1881. Subsequently the suit was revived against his executrix, and, in 1884, the complainant began to put in his proofs.

This great delay might have justified the court in dismissing the complainant's bill, without looking at the merits. It certainly requires of the court to take care that the dangers of injustice, which always attend the investigation of facts long since transpired, are not overlooked, and that, before disturbing the *status* acquiesced in by both parties for so many years, very convincing evidence of the propriety of a change shall be adduced.

The defendant executrix, while insisting that upon an accurate statement of accounts a large balance would be found due to her, yet, because of the disadvantage under which she labors, in not being personally cognizant of the transactions involved, which occurred more than thirty years ago, waives her right to an accounting, and asks that a simple decree of dismissal of the bill be rendered, unless the court shall conclude, on the testimony already taken, that there appears a fair probability of a balance being shown in favor of the complainant. This course could not work injustice to the complainant, for in the six hundred and fifty printed pages of depositions and exhibits, mainly offered by him, the substance of the available proof, on both sides, is undoubtedly before us.

The chief element in the account relates to the construction of the Lebanon Valley Railroad.   By articles of agreement, made April 1st, 1854, Patrick O'Reilly had covenanted with the Lebanon Valley Railroad Company to furnish all the materials and implements, and to perform the labor necessary to construct and finish the grading, masonry, bridge superstructure and track laying, and other appurtenant work, of sections 1 to 40, inclusive, of said railroad, and to complete the same by January 1st, 1857, according to certain specifications and the instructions of the chief engineer of the company.   On April 24th, 1854, the complainant and his partner, Charles Tarrant (who soon withdrew), contracted with said O'Reilly to furnish all the materials and implements, and to perform all the labor necessary to construct and finish the grading and masonry of sections 14 to 26, inclusive, of said railroad, and to complete the same by August 1st, 1855, according to the same specifications and the instructions of said chief engineer.   For matters arising out of this contract, the complainant claims a credit of $499.153.75.

Of this claim the defendant admits three items, as set out in a synopsis by counsel of the complainant, viz.,

|  |  |  |  |
|---|---|---|---|
| $84,194 | 00 | | |
| 327,135 | 55 | | |
| 2,500 | 00 | | |
| | | $413,829 | 55 |

Which are the same as the engineer's final estimate for complainant, $412,993 35
And a charge for ballast erroneously omitted from the estimate, 836 20
$413,829 55

The next item in the claim is for $8,450, of which $1,000 are represented by two notes of O'Reilly, and may be conceded. The residue of the item, $7,450, has no support, except the testimony of the complainant that his book-keeper, Mr. Bowen, some time before 1859, presented to him an account showing that so much money had been returned by Tarrant & Co. to

Patrick O'Reilly between June 15th, 1855, and August 15th,. 1856. This sum, $7,450,.should be disallowed.

The next item in the claim is for $61,608.91, a charge made for the "additional cost of rock excavation and loss on the same under the modified contract."

In support of this item the complainant takes two positions— one is that in the grading of his sections of the railroad there was discovered a flinty rock which was not embraced in his contract, and for the excavation of which he is, therefore, entitled to. charge a fair price;' the other is that, because of the unexpected hardness of this rock, O'Reilly agreed to pay him the cost of excavating it.

We think it clear that the rock is included in the contract. The complainant stipulated to furnish all the materials and implements, and perform all the labor necessary to construct and finish the grading of his sections, and the grading was expressly defined in the contract to include all the excavations and embankments required. This stipulation could not possibly be met without the excavation of the rock in question. It is true that in one clause of the contract Patrick O'Reilly engages that,. whenever the contract shall be wholly completed on the part of the contractors, he will pay "for excavation of solid rock requiring blasting or sledging sixty-five cents per cubic yard," and another clause declares that "stratified rock requiring sledging or blasting shall be paid for as solid rock;" yet there is nothing in these clauses which at all impinges upon the obligation of the complainant to do whatever was needed to grade the road. Nor do these clauses, fairly interpreted, contain any implication that by "solid rock" was meant only "stratified rock." On the contrary, the clause as to "stratified rock requiring sledging or blasting" was evidently introduced to repel a. possible construction, unfavorable to the contractors, that rock of that character should be classed as "loose rock," for which a lower price was to be paid. It is plain as English words can make it, that no. rock can be too hard to be classified as "solid rock." Nor can. the contract be changed because of the fact that the railroad company, before asking, for proposals to build its road, had made.

borings which indicated that the rock along its line was not so hard as that encountered by the complainant. The fullness and honesty of these borings are not questioned; their only defect was that they did not go far enough below the rock surface to reach the flinty substratum. But all parties concerned were bound to draw their own inferences from the facts which the borings disclosed, and there is nothing to show that either the company with O'Reilly, or O'Reilly with the complainant, assumed any risk touching the inferences which should be drawn.

With regard to the complainant's other position, that because of the unexpected hardness of the rock O'Reilly agreed to a modification of the written contract, much evidence has been taken. Upon a careful consideration of the testimony, we are unable to find that O'Reilly bound himself to any modification as to this rock beyond that stated in his letter to the complainant, dated December 14th, 1855, wherein he agreed to make good to the latter a deficiency of $9,156.92 (which was the difference between his contract price and the actual cost of excavating the rock on five sections for the five months ending October 31st, 1855), and to allow him thereafter seventy-three cents per cubic yard for hard rock, being the price which O'Reilly was to receive from the company. This modification is embraced in the final estimate already mentioned, to the extent of allowing seventy-three cents per cubic yard for all solid rock excavated, whether before or after October 31st, 1855. It only remains to determine how much more should be allowed to meet the stipulations of the letter. This would be ascertained by deducting from $9,156.92, the amount of eight cents per cubic yard for all solid rock excavated before October 31st, 1855 (eight cents being the difference between the original contract price, sixty-five cents, on which the deficiency of $9,156.92 was based, and the modified price, seventy-three cents, which is covered by the final estimate). The printed case does not show the total amount of solid rock excavated before October 31st, 1855, but it does show that in the five preceding months there were excavated twenty-two thousand seven hundred and ninety-eight cubic yards on sections 18, 19, 20, 21 and 22, which, at eight cents per yard,

amount to $1,823.84. It is, therefore, certain that of this item of $61,608.91 not more than $7,333.08 can be allowed.

The next item in the $499,153.75 claimed by the complainant is $5,119.55 for extra work. This item has sufficient support in the evidence to induce the court to regard it, for the present, as a possible credit.

The next item is for damages ($10,033.49), said to be occasioned by a suspension of work under the contract during the winter of 1854–55. On this head $2,500 are embraced in the final estimate already credited. The residue, $7,533.49, is disputed. Passing by the objections to this item beyond $2,500, for which the chancellor rejected the surplus, it suffices to note that the bill of complaint asks no more than $5,000 for the aggregate of expenses and losses incurred through this suspension. Aside from the technical limit thus imposed upon the complainant's demand, it is just to conclude that a claim, made while the facts were yet fresh in the memory, but sufficiently long after the occurrence to permit of the fullest deliberation, is more likely to be accurate than one made over twenty years later, when the claimant's adversary is dead. This item should not be allowed for more than $2,500 beyond the final estimate.

The last item in the claim is $2,612.25 for property destroyed by the riotous conduct of the complainant's employees. There is no principle upon which this can be charged against the defendant.

To sum up, we thus find, as the best possible showing of the complainant, on account of matters arising from this Lebanon Valley Railroad contract—

| | | |
|---|---:|---:|
| The engineer's final estimate | $412,993 | 35 |
| Ballast omitted from ditto | 836 | 20 |
| Two notes of O'Reilly | 1,000 | 00 |
| Extra allowance for hard rock | 7,333 | 08 |
| Extra work | 5,119 | 55 |
| Loss by suspension (extra) | 2,500 | 00 |
| Total | $429,782 | 18 |

Upon the other side of this railroad construction account, the

complainant admits debits against himself amounting to $432,-260.53, and the defendant produces vouchers, not only for these admitted debits, but also for other sums, in the shape of receipts, notes and checks, which seem chargeable against the complainant in connection with this contract, to an amount exceeding $20,000. In explanation of this overpayment, it should be remarked that the last of complainant's current estimates, according to which payments were made, was for $435,976.05. These current estimates were confessedly only approximate, and were subject to correction by the final estimate, which was required by the contract to be exact. The final estimate was made by the complainant's brother, who was the chief engineer, and its accuracy is not impugned. The discrepancies between it and the next preceding current estimate are accounted for on grounds which need not be further noticed than by saying that they lend no support to the complainant's claim.

Thus, on this construction account, we find a balance against the complainant of not less than $2,478,35, and of probably much more than that.

The other elements of the account may be briefly disposed of. The complainant's counsel, in his synopsis, styles them "the Contractor account," "the Sills account," "the Greenwood account," "the Sea Gull Engine account," "the Plant account" and "the Bowen Farm account." According to his statement, the aggregate of all shows to the credit of the complainant $26,318.69, and to the credit of the defendant $24,583.37, giving a balance in favor of the complainant of $1,735.32. Conceding to the complainant, therefore, everything claimed for him on these elements of the account, they would not meet the balance against him on the railroad construction account. But so much cannot be conceded. On the "Greenwood account," he claims a credit of $8,422.48, which consists of charges against O'Reilly for the services of complainant, the labor of his teams and money expended by him in the Greenwood tract enterprise. Both the bill and the answer aver that this enterprise was a partnership affair between O'Reilly and the complainant, the bill alleging that O'Reilly was to give the complainant one-half of the tract,

the answer averring that O'Reilly was *to sell* him the half at the price paid by O'Reilly for it. The answer is in this responsive to the bill, and, being unopposed by any legal evidence, must stand as the truth. The testimony indicates that the venture was a losing one, and that O'Reilly suffered as heavy a loss as the complainant sustained. This claim of credit therefore fails.

We have no hesitation in concluding that upon a full and fair accounting no balance would be found due to the complainant, and are therefore of opinion that his bill should be dismissed, upon the defendant's discontinuing the suit begun by attachment in the Camden circuit.

To that end let the decree below be reversed.

*Decree unanimously reversed.*